Theron Seales was convicted in the Circuit Court of Jefferson County of the first degree rape of his seven-year-old stepdaughter. The Court of Criminal Appeals reversed the conviction and rendered a judgment in Seales's favor.Seales v. State, 581 So.2d 1188 (Ala.Crim.App. 1990). The State's application for rehearing in that court was overruled. The State then filed a petition for a writ of certiorari, which was granted. We reverse and remand.
See the opinion of the Court of Criminal Appeals for a full explanation of the facts and circumstances surrounding this case.
The State maintains that the Court of Criminal Appeals erred to reversal in holding that Seales was entitled to a judgment of acquittal. Specifically, the State contends that it was reasonably inferable from the evidence that Seales was guilty beyond a reasonable doubt; therefore, it argues, the question of Seales's guilt or innocence was one properly reserved for the jury. We agree.
The standard for appellate review of an issue regarding the sufficiency of the evidence in a case such as this one was set out in Dolvin v. State, 391 So.2d 133 (Ala. 1980):
 " 'In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but *Page 1193 
guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039
(5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961).
 " '[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):
 " ' "Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. . . .
 " ' "The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGlamory, 441 F.2d at 135 and 136." ' "
391 So.2d at 137-38, quoting Cumbo v. State, 368 So.2d 871, 874
(Ala.Crim.App. 1978), cert. denied, Ex parte Cumbo,368 So.2d 877 (Ala. 1979). See, also, Robinette v. State, 531 So.2d 697
(Ala. 1988). (Emphasis added in Dolvin.)
The indictment in the present case charged that Seales, who was over 16 years of age, had engaged in "sexual intercourse" with his stepdaughter, who was under 12 years of age. This charge was based on Ala. Code 1975, § 13A-6-61(a)(3), which reads, in pertinent part, as follows:
 "(a) A male commits the crime of rape in the first degree if:
". . . .
 "(3) He, being 16 years [old] or older, engages in sexual intercourse with a female who is less than 12 years old."
"Sexual intercourse" is defined in Ala. Code 1975, § 13A-6-60(1) (1990 Cum.Supp.), as follows:
 "Such term has its ordinary meaning and [sexual intercourse] occurs upon any penetration, however slight; emission is not required."
The sole issue presented for our review is whether the State presented sufficient evidence of penetration to support the jury's guilty verdict.
The opinion of the Court of Criminal Appeals in this case correctly states the law with respect to the amount of penetration that is necessary to constitute rape:
 "This court addressed a statutory rape situation in Patrick v. State, 495 So.2d 112 (Ala.Crim.App. 1986), where the female victim was 10 years old at the time of the rape. In Patrick, we stated:
 " 'Because of the language and communication difficulties of an underage victim, more than a few cases have dealt with the matter of proving what was formerly referred to as a "statutory rape." Whether there was actual penetration in a rape prosecution is a question of fact to be determined by the jury.'
 "495 So.2d at 114. See, also, Edmonds v. State, 380 So.2d 396, 398 (Ala.Crim.App. 1980) ('nature' of penetration 'need not be proved in any particular form of words').
 "Likewise, in discussing the requisite element of penetration in a rape conviction, we stated in Mims v. State, 500 So.2d 100, 102 (Ala.Crim.App. 1986), . . . as follows:
 " 'Appellant is correct . . . that "penetration by the male sex organ into the sexual organ of the female must be shown in order to sustain a conviction of rape. . . ." Jackson v. State, 471 So.2d 516, 517 (Ala.Crim.App. 1985); *Page 1194 Long v. State, 370 So.2d 354 (Ala.Crim.App. 1979); Smith v. State, 345 So.2d 325
(Ala.Crim.App. 1976). However, "[t]he nature of the penetration that is essential for a rape conviction need not be proved in any particular form of words." Swint v. State, 455 So.2d 285, 287 (Ala.Crim.App. 1984); Edmonds v. State, 380 So.2d 396, 398 (Ala.Crim.App. 1980).'
 "The amount of penetration that is required to meet the 'sexual intercourse' element of rape is minimal:
 " 'In Vol. 75 C.J.S. Rape § 10b we find the following:
 " ' "However, penetration to any particular extent is not required, . . . nor need there be an entering of the vagina or rupturing of the hymen, the entering of the vulva or labia being sufficient; but some degree of entrance of the male organ within the labia pudendum is essential." ' "
 "Harris [v. State], 333 So.2d 871 [Ala. Crim. App. 1976] (emphasis added)."
The opinion of the Court of Criminal Appeals also adequately summarizes the evidence relied upon by the State in support of its argument that penetration was sufficiently proved:
 "Marvel Seales, [Seales's] ex-wife, testified that during the early morning hours of November 20, 1988, she awoke and discovered that [Seales] was not in their bed. She got up and started searching for him and found him standing beside her daughter's bed.
 "Marvel stated that [Seales] was dressed only in his underwear. She noticed that her daughter's legs were hanging off the bed, so she walked over to her to put her back into bed and noticed at that time that her panties were about 'midway down her thighs.' Her daughter told her that [Seales] had pulled her off of her bed, pulled down her panties, 'and took his private part to her.' Her daughter also stated that [Seales] 'did it to me when you went into the hospital to have the baby, too.'[1]
 "After talking with the police, Marvel Seales took her daughter to Children's Hospital in Birmingham, Alabama. Her daughter was examined there by Dr. Jane Fesenmeier in the emergency room.
 "Dr. Fesenmeier testified that she examined the prosecutrix '[f]or possible sexual abuse.' According to Dr. Fesenmeier, the prosecutrix stated that her stepfather touched her in her 'private heart' and that he had done it once before.
 "Dr. Fesenmeier testified that she examined the prosecutrix and found 'some redness, erythema, around the outside of the vagina, opening of her vagina and along the labia.' While we do not have benefit of the diagram, the record reveals that Dr. Fesenmeier drew a sketch of the vaginal area and testified as follows:
 " 'A. Okay. This is her vagina. There was redness around here and up along the side (indicating).
 " 'Q. Okay. Was there any redness other than just right there around the opening area?
 " 'A. No. Well, there was some that extended up along the sides here (indicating).
 " 'Q. Okay. And let me ask you this for the jury to understand: This is an opening with the legs spread out; is that correct?
" 'A. Yes.
" 'Q. Okay. And is this the vagina area itself?
 " 'A. Yes. This is the vagina and the opening to the vagina, and the labia.
 " 'Q. Okay. And when you say labia, what are you speaking of, the lip area around the vagina area itself?
" 'A. Yes.
 " 'Q. Okay. And then there was redness — would it be in close proximity to the opening itself?
 " 'A. Yes. Right along the opening of the vagina and up along the sides up here (indicating).' *Page 1195 
 "She further testified that she found no tears, bruises, or lacerations but that it was not uncommon not to find evidence of trauma in sexually abused children. She stated that the hymen was intact and acknowledged on cross-examination that this would indicate that penetration did not extend past the hymenal opening.
 "Dr. Fesenmeier referred the prosecutrix to Dr. Christy Mulchahey of the Department of Obstetrics and Gynecology at the University of Alabama in Birmingham. Dr. Mulchahey testified that the prosecutrix indicated that her stepfather touched her in the genital area with his hand and something else, but she was not clear as to what. Dr. Mulchahey drew two figures, one of a little girl and one of a man. The prosecutrix pointed to her genital area when asked where he touched her and pointed to his hand and genital area when asked with what he touched her.
 "The prosecutrix testified that she was awakened by her stepfather. She stated that he placed her on the floor, pushed up her night shirt, took off her panties, and put some Vaseline on her 'private part.' She stated that he then put his 'private part' on her 'back private part.' According to the prosecutrix, [Seales] then tried to push his 'private part' into her 'front private part,' but '[i]t couldn't go up in there.' She also said that his 'private part' was hard during this time.
 "According to the prosecutrix, [Seales] heard her mother, so he placed her back on the bed and tried to put her panties back on. She also testified that [Seales] on a previous occasion, while her mother was in the hospital, pulled her panties down and put his private part on her front private part.
 "[Seales] took the stand and testified. He wholly denied the incident and claimed that when his wife awoke on the morning [in question] he was in the bathroom. According to [Seales], she came at him screaming and accusing him of raping her daughter. He also denied sexually abusing his stepdaughter on a previous occasion."
581 So.2d at 1189-90.
To this we add only the following testimony from the minor victim:
 "Q. . . . When [Seales] laid you on the floor you said he took off your clothes, tell us exactly what he did with your clothes, how he took them off of you?
"A. He pulled them off slow.
 "Q. He pulled them off slow. What did he do with your shirt?
"A. He left it on.
 "Q. He left it on you. Did he push it up or pull it off of you anywhere?
"A. Pushed it up.
 "Q. He pushed it up. Okay. What else did you have on besides this red shirt?
"A. My panties.
 "Q. Okay. What, if anything, did he do with your panties?
"A. He took them off.
 "Q. He took them off. Did he take them off your feet?
"A. (Witness nods head.)
 "Q. He did. Okay. Once he laid you down on the floor right there what, if anything, did he do next?
"A. He put some Vaseline on me.
 "Q. He put some Vaseline on you. Where did he put the Vaseline?
"A. On my private part.
 "Q. On your private part. After he put the Vaseline on your private part — What did he put it on there with, his hands or with something else?
"A. His private part.
 "Q. With his private part. Okay. Once [Seales] laid you down there tell me what he did to you?
"A. He put his private part on me.
 "Q. He put his private part on you. Where did he put it on you?
"A. On my back private part.
 "Q. Okay. Let me ask you this: While you were laying on the floor where did he put it on you?
"A. On my back — I mean on my front.
 "Q. Okay. When you were laying on the floor were you looking up at [Seales]? *Page 1196 
"A. No.
"Q. Where were you looking?
"A. Down on the floor.
 "Q. Okay. When you were laying on the floor you were looking down on the floor?
"A. Yes.
 "Q. Okay. And where did his private part touch your private part?
"A. On my back private part.
 "Q. Okay. Did it ever touch any of your other private part?
"A. No.
 "Q. Okay. While you were laying there on the floor did it ever touch — Do you have one or two private parts?
"A. Two.
 "Q. You have two private parts. You have a front private part and a back private part?
"A. Yes.
 "Q. Okay. When he had you laying on the floor tell me exactly what he did first? You said he put Vaseline on you?
"A. (Witness nods head.)
"Q. Okay. What did he do then?
"A. Then he put his private part on me.
 "Q. He put his private part on you. Did he put it on your front private part or your back private part?
"A. Back.
 "Q. Okay. And when he put it on your back private part what did he start doing then?
 "A. Then he tried to push it up in my front part — private part.
 "Q. Okay. So he put it on your back private part, and then he tried to push it in your front private part?
"A. (Witness nods head.)
 "Q. Okay. When he started pushing it in your front private part what happened then?
"A. It couldn't go up in there.
 "Q. It couldn't go up in there. Okay. Once he started pushing it up in there what, if anything, happened next? What did he do after that, once it wouldn't go up in there?
"A. Then he heard my mama.
 "Q. Okay. Let me ask you this: Were you still on the floor then?
"A. No.
 "Q. Okay. Did he ever move you from the floor anywhere else in the room?
"A. On my bed.
 "Q. He put you on your bed. Once he put you on your bed how were you laying then?
"A. On my back part.
"Q. You were laying on your back on the bed?
"A. (Witness nods head.)
 "Q. Okay. When he laid you on the bed what, if anything, happened then? Did he touch you or do anything then?
 "A. Then he pulled up my panties a little bit. And then my mama saw my legs off the bed.
 "Q. Okay. So he pulled up your panties a little bit when he laid you on the bed?
"A. (Witness nods head.)
 "Q. Okay. Let me ask you this: When you talk about your private parts, you said your front private parts and your back private parts, have you learned a name for that now? Your vagina, have you heard that name?
"A. (Witness nods head.)
 "Q. Okay. Is that what you're talking about with your front private part?
"A. (Witness nods head.)
 "Q. Okay. And for his private parts, have you learned a name for his private parts?
"A. Yes.
"Q. And what is the name for his private parts?
"A. Penis.
 "Q. His penis. And is that what he had on you that evening that he was trying to put in you?
"A. Yes."
". . . .
 "Q. [W]hen you told us earlier when [Seales] put his private part on your back side and pushed it up in your private part on your front, did it hurt?
"A. Yes."
The jury could have, and obviously did, find from the evidence that Seales had attempted *Page 1197 
to force his erect penis into the victim's vagina. Dr. Fesenmeier testified that there was "redness, erythema, around the outside of the [victim's] vagina, [the] opening of her vagina and along the labia." There was certainly sufficient evidence from which the jury could have reasonably inferred that Seales's penis had penetrated the victim's "pudendum" or "vulva," and, consequently, that Seales had had "sexual intercourse" with the victim within the meaning of §13A-6-61(a)(3). The terms "pudendum" or "vulva," as generally applied, include the parts of the external genital organs of the human female such as the labia majora, the labia minora, and the vaginal orifice. See C.M. Goss, Gray's Anatomy, Ch. 17, pp. 1328-29 (28th ed. 1966).
The Court of Criminal Appeals appears to have taken the view that the evidence could be reasonably explained under a theory consistent with Seales's claimed innocence (i.e., that Seales had only "touched" the victim's genitalia with his penis).[2] In so doing, the court substituted its view of the evidence for that of the jury. The jury, by finding Seales guilty of the offense charged, was obviously satisfied that the evidence excluded every reasonable hypothesis except that of guilt. As in Robinette v. State, supra, it was the jury's call. See, also, Tedder v. State, 547 So.2d 601 (Ala. 1989).
For the foregoing reasons, the judgment of the Court of Criminal Appeals is reversed, and the case is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] Testimony at trial indicated that Marvel Seales had a second child and had been hospitalized for a short time a couple of weeks following the delivery.
[2] We are at a loss to explain why the following sentence was included in the court's opinion as support for its holding:
 "The testimony of Dr. Fesenmeier established, as best as we can determine from the record, that the redness and irritation was around the 'outside' of the vagina, along the 'opening' of the vagina, and along the 'sides' of the vagina."
In the paragraph preceding this sentence the court correctly noted that penetration of the vagina did not have to be shown. It is clear that the "redness" testified to by Dr. Fesenmeier was within the victim's pudendum or vulva.